# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>*ex rel.* [UNDER SEAL],<br><br>            Plaintiff,<br>    v.<br><br>[UNDER SEAL],<br><br>            Defendants. | **Civil Action No.** _____<br><br>**Hon.** _____<br><br>**QUI TAM COMPLAINT**<br><br>**FILED UNDER SEAL**<br>**UNDER 31 U.S.C. § 3730(b)(2)**<br><br>**JURY TRIAL DEMANDED** |

SHN\834737.1

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>*ex rel.* AIDAN FORSYTH,<br><br>              Plaintiff-Relator,<br><br>    v.<br><br>BIG NIGHT ENTERTAINMENT GROUP, INC., BIG NIGHT MANAGEMENT GROUP, LLC, BIG CAUSEWAY, LLC, BIG MIND CREATIVE GROUP, LLC, BIG NIGHT VENUES, LLC, BIG NIGHT VENUES 2, LLC, BIG NIGHT VENUES 3, LLC, BIG NIGHT VENUES 4, LLC, BIG NIGHT VENUES BOSTON, LLC, BIG NIGHT VENUES BOSTON 1, LLC, BIG NIGHT VENUES BOSTON 2, LLC, BIG NIGHT VENUES BOSTON 3, LLC, BIG NIGHT VENUES BOSTON 4, LLC, BIG NIGHT VENUES BOSTON 5, LLC, BIG NIGHT VENUES BOSTON HARBOR, LLC, BIG NIGHT VENUES BOSTON HARBOR 2, LLC, and BIG NIGHT VENUES FOXBORO, LLC,<br><br>              Defendants. | Civil Action No. _____<br><br>Hon. _____<br><br>**QUI TAM COMPLAINT**<br><br>**FILED UNDER SEAL<br>UNDER 31 U.S.C. § 3730(b)(2)**<br><br>**JURY TRIAL DEMANDED** |

On behalf of the United States of America (the "United States" or the "Government"), Plaintiff and Relator Aidan Forsyth ("Relator") files this *qui tam* action against Defendants Big Night Entertainment Group, Inc. ("BNEG"), Big Night Management Group, LLC ("BNMG"), Big Causeway, LLC ("BC"), Big Mind Creative Group, LLC ("BMCG"), Big Night Venues, LLC ("BNV"), Big Night Venues 2, LLC ("BNV2"), Big Night Venues 3, LLC ("BNV3"), Big Night Venues 4, LLC ("BNV4"), Big Night Venues Boston, LLC ("BNVB"), Big Night Venues Boston 1, LLC ("BNVB1"), Big Night Venues Boston 2, LLC ("BNVB2"), Big Night Venues Boston 3, LLC ("BNVB3"), Big Night Venues Boston 4, LLC ("BNVB4"), Big Night Venues Boston 5,

1

SHN\834737.1

LLC ("BNVB5"), Big Night Venues Boston Harbor, LLC ("BNVBH"), Big Night Venues Boston Harbor 2, LLC ("BNVBH2"), and Big Night Venues Foxboro, LLC ("BNVF") (collectively, "Big Night" or "Defendants") and alleges as follows:

## INTRODUCTION

1.      This is an action to recover treble damages, civil penalties and all other remedies on behalf of the United States of America in connection with the Defendants' materially false and fraudulent applications to the Government for loans under the Small Business Administration's ("SBA") Paycheck Protection Program ("PPP") in violation of the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* (the "FCA").

2.      Pursuant to the FCA, Relator seeks to recover, on behalf of the United States of America, damages and civil penalties arising from false or fraudulent claims for payment that Defendants submitted or caused to be submitted to the Federal Government-subsidized PPP loan program.

## SUMMARY OF ALLEGATIONS

3.      Big Night Entertainment Group, Inc. was founded in 2006 by "veteran nightclub owners" Edward A. Kane ("Ed Kane"), Joseph Kane ("Joe Kane"), and "marketing and entertainment expert" Randy Greenstein. *See* www.bignight.com/our-story. At all times relevant to this action, the company described itself as "exist[ing] to create unique dining and nightlife experiences that transcend tradition and status quo." *Id.*

4.      Big Night owns and manages nightclubs and restaurants in New England, primarily in the Boston area and at Foxwoods Resort Casino in Connecticut. Big Mind Creative Group, an affiliated company, is a marketing, advertising and design creative agency.

5.      Upon information and belief, BC, BMCG, BNV, BNV2, BNV3, BNV4, BNVB, BNVB1, BNVB2, BNVB3, BNVB4, BNVB5, BNVBH, BNVBH2, and BNVF were entities under

2

the ownership and control of Ed Kane and/or BNEG and/or a de facto partnership among Ed Kane, Joe Kane, and Randy Greenstein, and thus constituted a "single corporate group" under SBA regulations.

6.     Defendants applied for and received 15 first-draw Paycheck Protection Program (PPP) loans totaling approximately $9 million, of which approximately $8 million were forgiven. Defendants applied for and received all of their first-draw funds before April 28, 2020, the effective date of the SBA's $20,000,000.00 affiliation limit for first-draw PPP loans.

7.     In or about January through April 2021, Defendants applied for and received 15 second-draw PPP loans totaling approximately $13 million, which were later forgiven. However, approximately $9 million exceeded the SBA's $4 million limit for a single corporate group, which became effective January 12, 2021.[1]

8.     Defendants used Eastern Bank as its lender for all of the PPP loans.

9.     The loan applications required the applicant's designated representatives to certify that Defendants were eligible businesses under SBA rules. The applications also required the representative to acknowledge that the information submitted was material to the Government, to certify that it was true and correct, and to acknowledge that submitting a materially false application would violate Federal law.

10.    However, upon information and belief, in an effort to circumvent the $4 million corporate group cap for second-draw loans, Defendants' representatives falsely and fraudulently certified that each applicant was eligible under SBA rules, including that it had no (or a limited

---

[1] Although Relator has no information to allege wrongdoing in this regard, it is notable that Defendants and other Big Night entities essentially "maxed out" the Government's COVID financial assistance programs. Big Night entities received over $30 million in Shuttered Venue Operators Grants, $2 million in Restaurant Restoration Fund grants, and $1.7 million in Economic Injury Disaster loans.

3

SHN\834737.1

number of) affiliated businesses. They also expressly acknowledged that this was a material question, and that submitting a materially false application would violate federal law.

11.    In reliance upon Defendants' false statements and certifications, the banks extended second-draw PPP loans to Defendants in an amount totaling approximately $13 million.

12.    In or around October 2021 through May 2022, Defendants sought and obtained forgiveness of their second-draw PPP loans.

13.    The PPP Loan Forgiveness Application Form required the applicant's representative to certify that they had complied with all requirements in the PPP Rules provided under the Small Business Act, the PPP interim final rules, and guidance issued by SBA through the date of the forgiveness application. The application also required the representative to certify that all information provided was "true and correct in all material respects" and to acknowledge that "knowingly making a false statement to obtain forgiveness of an SBA-guaranteed loan" was punishable under Federal law with imprisonment and/or fines.

14.    Upon information and belief, Defendants' representatives falsely and fraudulently certified that the businesses had all complied with the SBA's PPP loan requirements and were therefore entitled to loan forgiveness.

15.    Had Defendants been truthful in their statements and certifications to the banks, *i.e.* that Defendants had already received second-draw PPP loans far exceeding the SBA's $4 million limit for a single corporate group, the loans never would have been forgiven.

16.    Relator files this *qui tam* lawsuit to enable the Government to recover from Defendants the SBA-guaranteed and forgiven loan proceeds that were provided to Defendants as the result of their wrongdoing, as well as to recover treble damages and/or penalties.

4

## JURISDICTION, VENUE, AND SPECIAL REQUIREMENTS

17.    This Court possesses subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under the laws of the United States, under 31 U.S.C. § 3729 of the False Claims Act, and under 28 U.S.C. § 1345, which provides the United States District Courts with original jurisdiction over all civil actions commenced by the United States of America.

18.    In addition, the FCA specifically confers jurisdiction upon the United States District Courts under 31 U.S.C. § 3732. This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a) because the Defendants maintained offices, did business, and/or submitted PPP Loan applications and requests for loan forgiveness to lenders in or from this District.

19.    Venue is proper in this District under 31 U.S.C. § 3732(a) because certain of the acts complained of herein occurred in this District.

20.    In accordance with 31 U.S.C. § 3730(b)(2), this Complaint has filed been filed *in camera* and will remain under seal for a period of at least 60 days, and shall not be served on the Defendants until the Court so orders.

21.    Pursuant to 31 U.S.C. § 3730(b)(2), the Relator must provide the Government with a copy of the Complaint and a written disclosure of substantially all material evidence and material information in his possession contemporaneous with the filing of the Complaint. Relator has complied with this provision by serving copies of the Complaint and such disclosure upon Joshua S. Levy, Acting United States Attorney for the District of Massachusetts, and upon the Honorable Merrick B. Garland, Attorney General of the United States.

22.    Relator is not aware that the allegations in this Complaint have been publicly disclosed. In any event, this Court has jurisdiction under 31 U.S.C. § 3730(e)(4) because the

5

Relator is an "original source" since he has voluntarily provided his information to Government before filing this Complaint, and has knowledge, which is both direct and independent of, and materially adds to, any public disclosures to the extent they may exist.

## PARTIES

23.     At all times relevant to this action, Plaintiff/Relator Aidan Forsyth resided at 55 West 8th Street, New York, NY 10011.

24.     At all times relevant to this action, Defendant Big Night Entertainment Group, Inc. was a Massachusetts corporation incorporated on or about November 21, 2006. Its principal place of business was located at 470 Atlantic Avenue, Suite 301, Boston, MA 02210. BNEG owned and managed nightclubs and restaurants.

25.     Defendant Big Night Management Group, LLC was a Massachusetts Limited Liability Company organized on or about October 19, 2017. It was a restaurant management business. Its principal place of business was located at 470 Atlantic Avenue, Suite 301, Boston, MA 02210. Edward A. Kane was its Manager.

26.     Defendant Big Causeway, LLC was a Massachusetts Limited Liability Company organized on or about April 6, 2017. It was a restaurant and nightclub business. Its principal place of business was located at 470 Atlantic Avenue, Suite 301, Boston, MA 02210. Edward A. Kane was its Manager.

27.     Defendant Big Mind Creative Group LLC was a Massachusetts Limited Liability Company organized on or about January 1, 2019. It was a marketing, advertising and design creative agency. Its principal place of business was located at 470 Atlantic Avenue, Suite 301, Boston, MA 02210. Edward A. Kane was its Manager.

6

28.    Defendant Big Night Venues, LLC was a Massachusetts Limited Liability Company organized on or about September 10, 2007.  It was a restaurant business.  Its principal place of business was located at 470 Atlantic Avenue, Suite 301, Boston, MA 02210. Edward A. Kane was its Manager.

29.    Defendant Big Night Venues 2, LLC was a Massachusetts Limited Liability Company organized on or about March 12, 2009. It was a restaurant business. Its principal place of business was located at 470 Atlantic Avenue, Suite 301, Boston, MA 02210. Edward A. Kane was its Manager.

30.    Defendant Big Night Venues 3, LLC was a Massachusetts Limited Liability Company organized on or about March 19, 2010. It was a bowling and restaurant business. Its principal place of business was located at 470 Atlantic Avenue, Suite 301, Boston, MA 02210. Edward A. Kane was its Manager.

31.    Defendant Big Night Venues 4, LLC was a Massachusetts Limited Liability Company organized on or about January 20, 2016. It was a restaurant and bar business. Its principal place of business was located at 470 Atlantic Avenue, Suite 301, Boston, MA 02210. Edward A. Kane was its Manager.

32.    Defendant Big Night Venues Boston, LLC was a Massachusetts Limited Liability Company organized on or about February 9, 2011. It was in the business of managing restaurants and nightclubs.  Its principal place of business was located at 470 Atlantic Avenue, Suite 301, Boston, MA 02210. Edward A. Kane was its Manager.

33.    Defendant Big Night Venues Boston 1, LLC was a Massachusetts Limited Liability Company organized on or about September 27, 2010.  It was a restaurant business.  Its principal

7

place of business was located at 470 Atlantic Avenue, Suite 301, Boston, MA 02210. Edward A. Kane was its Manager.

34.    Defendant Big Night Venues Boston 2, LLC was a Massachusetts Limited Liability Company organized on or about February 9, 2011. It was a restaurant business. Its principal place of business was located at 470 Atlantic Avenue, Suite 301, Boston, MA 02210. Edward A. Kane was its Manager.

35.    Defendant Big Night Venues Boston 3, LLC was a Massachusetts Limited Liability Company organized on or about May 10, 2011. It was a restaurant business. Its principal place of business was located at 470 Atlantic Avenue, Suite 301, Boston, MA 02210. Edward A. Kane was its Manager.

36.    Defendant Big Night Venues Boston 4, LLC was a Massachusetts Limited Liability Company organized on or about July 10, 2015. It was a restaurant business. Its principal place of business was located at 470 Atlantic Avenue, Suite 301, Boston, MA 02210. Edward A. Kane was its Manager.

37.    Defendant Big Night Venues Boston 5, LLC was a Massachusetts Limited Liability Company organized on or about August 29, 2016. It was a restaurant business. Its principal place of business was located at 470 Atlantic Avenue, Suite 301, Boston, MA 02210. Edward A. Kane was its Manager.

38.    Defendant Big Night Venues Boston Harbor, LLC was a Massachusetts Limited Liability Company organized on or about November 27, 2017. It was a restaurant, nightclub and lounge business. Its principal place of business was located at 470 Atlantic Avenue, Suite 301, Boston, MA 02210. Edward A. Kane was its Manager.

8

39.    Defendant Big Night Venues Boston Harbor 2, LLC was a Massachusetts Limited Liability Company organized on or about July 9, 2018. It was a restaurant, nightclub and lounge business. Its principal place of business was located at 470 Atlantic Avenue, Suite 301, Boston, MA 02210. Edward A. Kane was its Manager.

40.    Defendant Big Night Venues Foxboro, LLC was a Massachusetts Limited Liability Company organized on or about January 20, 2016. It was a restaurant business. Its principal place of business was located at 470 Atlantic Avenue, Suite 301, Boston, MA 02210. Edward A. Kane was its Manager.

## GOVERNING LAWS, REGULATIONS, AND CODES OF CONDUCT
### The False Claims Act

41.    Originally enacted in 1863, the FCA was substantially amended in 1986 by the False Claims Amendments Act.  The 1986 amendments enhanced the Government's ability to recover losses sustained as a result of fraud against the United States.   Further clarifying amendments were adopted in May 2009 and March 2010.

42.    The FCA imposes liability upon any person who "knowingly presents, or causes to be presented [to the Government] a false or fraudulent claim for payment or approval"; or "knowingly makes, uses or causes to be made or used, a false record or statement material to a false or fraudulent claim"; or "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(A), (B), (G).  Any person found to have violated these provisions or conspired to have violated these provisions is liable for a civil penalty of at least $13,946.00 and up to $27,894.00 for each such false or fraudulent claim,

9

plus three times the amount of the damages sustained by the Government. 31 U.S.C. § 3729(a), 20 CFR Part 356 and 28 CFR Part 85 (*see* 88 FR 5776, Feb. 12, 2024).

43.    The FCA defines the terms "knowing" and "knowingly" to mean that a person (1) "has actual knowledge of the information"; (2) "acts in deliberate ignorance of the truth or falsity of the information"; or acts "in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A).  The statute provides that "no proof of specific intent to defraud" is required. 31 U.S.C. § 3729(b)(1)(B).

44.    The FCA also broadly defines a "claim" as one that includes "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that – (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government – (i) provides or has provided any portion of the money or property requested or demanded; or (ii) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(b)(2)(A).

45.    The FCA empowers private persons having information regarding a false or fraudulent claim against the Government to bring an action on behalf of the Government and to share in any recovery.  The complaint must be filed under seal without service on any Defendant. The complaint remains under seal while the Government conducts an investigation of the allegations in the complaint and determines whether to intervene in the action. 31 U.S.C. § 3730(b).

46.    In this action, and under well-established precedent, the false and fraudulent nature of Defendants' conduct is informed or measured by their violation of, or failure to comply with,

10

SHN\834737.1

certain statutes and regulations material to the submission of applications for government-subsidized and/or issued small business loans.

**The CARES Act Authorizes Paycheck Protection Program Loans and Economic Injury Disaster Loans and Grants**

47.    The Coronavirus Aid, Relief, and Economic Security ("CARES") Act (Pub. L. 116-136) (the "CARES Act" or the "Act") was enacted in March 2020 to provide emergency financial assistance to individuals and businesses affected by the COVID-19 pandemic. The Act provided the federal Small Business Administration ("SBA") with funding and authority to modify existing loan programs and establish a new loan program to assist small businesses adversely affected by the pandemic.

48.    Section 1102 of the CARES Act authorized the SBA to guarantee up to $349 billion in forgivable 7(a) loans to small businesses for job retention and other expenses. This program was called the Paycheck Protection Program ("PPP"). In April 2020, Congress authorized over $300 billion to additionally fund the PPP. In June 2020, the Paycheck Protection Program Flexibility Act of 2020 (Pub. L. 116-142) was enacted which changed certain provisions of the PPP, including provisions relating to the maturity of loans, the deferral of loan payments, and loan forgiveness.

49.    Under the PPP, eligible businesses could obtain *one* SBA-guaranteed PPP loan. Businesses were required to spend loan proceeds for employee compensation, rent or mortgage, and other specified expenses and, depending on their use of the loan proceeds, could qualify for loan forgiveness, up to the full amount of the loan.

50.    Early in the PPP loan program, the SBA instituted a limitation for businesses that were part of a single corporate group, permitting them to receive no more than $20,000,000.00 of PPP loans in the aggregate. The limitation defined businesses that were part of a "single corporate

11

SHN\834737.1

group" as those that were "majority owned, directly or indirectly, by a common parent." The limitation was effective for any loan that had not been fully disbursed as of April 30, 2020. *See* 85 Fed. Reg. 26324, 26325 (May 4, 2020).

51.    The SBA also instituted another limitation for businesses that were a part of a single corporate group, permitting them to receive no more than $4,000,000 of second-draw PPP loans in the aggregate. The limitation defined businesses that were part of a "single corporate group" as those that were "majority owned, directly or indirectly, by a common parent." The limitation was effective for any loan that had not been fully disbursed as of January 12, 2021. *See* 86 Fed. Reg. 3712 (January 14, 2021).

52.    The SBA delegated authority to third-party lenders to underwrite and approve the PPP loans. To obtain a PPP loan, a qualifying business (through its authorized representative) signed and submitted a PPP loan application (SBA Form 2483) online through the lender's application platform. The PPP loan application (SBA Form 2483) required the business (through its authorized representative) to acknowledge the PPP program rules and make certain affirmative certifications to be eligible to obtain the PPP loan.

53.    The borrower's authorized representative was required to certify, among other things, the business's average monthly payroll expenses and number of employees. This information was used to calculate the amount of money the business was eligible to be loaned. The applicant also had to submit documentation showing payroll expenses, among other things.

54.    All versions of the PPP loan application required the authorized representative to certify that the applicant had not and would not receive another loan under the Paycheck Protection Program, section 7(a)(36) of the SBA, not including the PPP second draw loans.

SHN\834737.1

55.    All versions of the application further required the applicant's representative to "certify that the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects" and acknowledge that "knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law."

56.    PPP loan applications were processed by participating financial institutions, which served as the lenders.  Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, were transmitted by the lender to the SBA in the course of processing the loan.  SBA paid processing fees to lenders.

57.    Once a borrower submitted its PPP loan application (SBA Form 2483) to a Lender, the participating lender processed the PPP loan application.  If a PPP loan application (SBA Form 2483) was approved by the participating lender, the lender submitted the application to SBA for an SBA loan number and after receiving that number it thereafter funded the PPP loan using its own monies, which were 100% guaranteed by the SBA.

58.    A borrower was required to use PPP loan proceeds only for certain permissible expenses: payroll costs, interest on mortgages, rent and utilities.  The PPP allows the interest and principal on the PPP loan to be entirely forgiven if the business spends the loan proceeds on these expenses within a designated period (between eight and 24 weeks from receiving the proceeds) and uses at least 60% of the proceeds for payroll expenses.

59.    In December 2020, the Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act (Pub. L. 116-260) extended and further funded the PPP loan program, and the SBA issued implementing rules.  Among other things, if a first-draw loan borrower fully repaid the loan prior to December 27, 2020, and the loan had not been forgiven, the borrower could

13

reapply for a second first-draw loan pursuant to the rules then applicable. *See* SBA Procedural Notice, Control No. 5000-20076 (Jan. 13, 2021). "The reapplication procedure depends on whether the Lender reported the loan to SBA as 'cancelled' or 'paid in full' as a result of the borrower's repayment before December 27, 2020." *Id.* at 3.

## SPECIFIC FRAUD ALLEGATIONS

60.     In the aggregate, the total value of second-draw PPP loans received by Defendants well exceeded the SBA's $4 million loan cap for members of a "single corporate group."

61.     Upon information and belief, BC, BMCG, BNV, BNV2, BNV3, BNV4, BNVB, BNVB1, BNVB2, BNVB3, BNVB4, BNVB5, BNVBH, BNVBH2, and BNVF were entities under the ownership and control of Ed Kane and/or BNEG and/or a de facto partnership among Ed Kane, Joe Kane, and Randy Greenstein, and thus constituted a "single corporate group" under SBA regulations.

### To Circumvent the $4 Million Cap, Defendants Apply for and Receive Second-Draw PPP Loans, which are Later Forgiven

62.     From in or about January 2021 through in or about April 2021, an authorized representative of each Defendant prepared or caused to be prepared an SBA application for a second-draw PPP loan (using SBA Form 2483-SD) on behalf of each Defendant.

63.     Upon information and belief, each representative falsely and fraudulently certified that each Defendant was a small business eligible for participation in the PPP Loan Program, by failing to acknowledge that the 15 entities that already received loans were part of the same single corporate group, and by omitting information concerning those companies' common ownership.

64.     Upon information and belief, each representative falsely and fraudulently answered "No" to the question, "Is the Applicant or any owner of the Applicant an owner of any other

14

SHN\834737.1

business, or have common management with, any other business?" and/or failed to provide a complete list of this required information. Specifically, the representative falsely and fraudulently omitted to state that the other entities that already received loans were affiliated businesses that shared common ownership.

65.     The applications required the applicant's authorized representative to "certify that the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects" and acknowledge that "knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law."

66.     Upon information and belief, the authorized representatives made these materially false and fraudulent representations in Defendants' applications for second-draw PPP loans in an effort to avoid the SBA's $4 million corporate group loan cap.

67.     Upon information and belief, each Defendant's authorized representative falsely certified or caused to be certified that "the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects" while acknowledging the federal criminal penalties attendant to "knowingly making a false statement to obtain a guaranteed loan from SBA."

68.     From in or about January through in or about April 2021, the authorized representatives submitted or caused to be submitted Defendants' second-draw PPP loan applications to the lender.[2]

69.     From in or about January through in or about April 2021, in reliance on Defendants' materially false and fraudulent representations and certifications in the loan application, the lender

---

[2] Defendants' initial second-draw loans were approved on or about January 28, 2021.

15

issued second-draw PPP loans to Defendants in the total amount of $12,740,438.50. This exceeded the SBA's cap by $8,740,438.50.

70.    From in or about October 2021 through in or about May 2022, the PPP loans were forgiven in full. These reimbursements cost the Government at least $12,864,876.70.

## THE GOVERNMENT HAS BEEN DAMAGED AS A RESULT OF DEFENDANTS' CONDUCT

71.    Defendants' materially false statements have caused the federal government to be defrauded of taxpayer funds in the approximate amount of $9 million.

## CLAIMS FOR RELIEF

## COUNT I

False Claims Act:
Presenting or Causing to be Presented False and Fraudulent Claims
U.S.C. § 3729(a)(1)(A)

72.    Relator repeats the allegations contained in the above paragraphs as if fully set forth herein.

73.    As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein, the Defendants have knowingly presented, and caused to be presented, false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A).

## COUNT II

False Claims Act:
Making or Using False
Records or Statement to Cause Claims to be Paid
31 U.S.C. § 3729(a)(1)(B)

74.    Relator repeats the allegations contained in the above paragraphs as if fully set forth herein.

16

SHN\834737.1

75.     As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein, the Defendants have knowingly made, used, or caused to be made or used, false records or statements – *i.e.*, the false representations made or caused to be made by Defendants – material to false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(1)(B).

## DEMANDS FOR RELIEF

**WHEREFORE**, Relator, on behalf of the United States Government, demands judgment against the Defendants, ordering that:

A.     That Defendants be ordered to cease and desist from submitting any more false claims, or further violating 31 U.S.C. § 3729, *et seq.*;

B.     That judgment be entered in Relator's favor and against Defendants in the amount of each and every false or fraudulent claim, multiplied as provided for in 31 U.S.C. § 3729(a), plus a civil penalty of not less than $13,946.00 and up to $27,894.00 per claim as provided by 31 U.S.C. § 3729(a), 20 CFR Part 356 and 28 CFR Part 85 (*see* 88 FR 5776, Feb. 12, 2024), to the extent such multiplied penalties shall fairly compensate the United States of America for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

C.     That Defendants be ordered to disgorge all sums by which they have been enriched unjustly by their wrongful conduct;

D.     That judgment be granted for Relator against Defendants for all costs, including, but not limited to, court costs, expert fees and all attorneys' fees incurred by Relator in the prosecution of this suit; and

E.     That Relator be granted such other and further relief as the Court deems just and proper.

17

## TRIAL BY JURY

Relator hereby demands a trial by jury as to all issues.

NYSTROM BECKMAN & PARIS LLP

/s/ Christine M. Kingston
William C. Nystrom (#559656)
Christine M. Kingston (#682962)
One Marina Park Drive, 15th Floor
Boston, MA 02210
(617) 778-9100
wnystrom@nbparis.com
ckingston@nbparis.com

SPIRO HARRISON & NELSON

Eric H. Jaso (pro hac vice pending)
363 Bloomfield Avenue
Second Floor
Montclair, NJ 07074
(973) 232-0881
ejaso@spiroharrison.com

*Attorneys for Relator*

Dated: June 28, 2024

18

SHN\834737.1